# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAUREL HILBERT,<br>4301 Massachusetts Avenue, N.W.<br>Unit 7002<br>Washington, D.C.  20016 | **Case No.** |
| *Plaintiff,* | |
| v. | **Class Action Complaint** |
| GRAHAM HOLDINGS COMPANY<br>1812 N. Moore Street, Suite 2100<br>Arlington, VA  22209<br>SERVE:<br>THE CORPORATION TRUST COMPANY<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, New Castle, DE  19801 | **Jury Trial Demand** |
| KAPLAN, INC.<br>1515 West Cypress Creek Road<br>Fort Lauderdale, FL  33309<br>SERVE:<br>C T CORPORATION SYSTEM<br>1015 15th Street, NW, Suite 1000<br>Washington, DC  20005 | |
| *Defendant.* | |

## VERIFIED COMPLAINT

## INTRODUCTION

1.     Plaintiff, Mr. Laurel Hilbert asserts the following claims against Defendants Graham

Holdings Company and Kaplan, Inc. ("Defendant") as follows:

2.     The Supreme Court of the United States has stated "[t]he Internet's prevalence and power

have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138

S. Ct. 2080, 2097 (2018) (the Court noted that in 1992, less than two (2) percent of

1

Americans had Internet access whereas by 2018 the number increased to roughly eighty-nine (89) percent).  This number has steadily increased as polling data from 2021 shows ninety-three (93) percent of American adults use the Internet.[1]

3.    Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[2]  According to the National Federation of the Blind's 2016 report (updated in 2019), approximately 16,400 visually impaired persons lived in the District of Columbia.[3]

4.    Plaintiff brings this civil rights action against Defendants for their failure to design, construct, maintain, update and operate their website and associated LSAT course materials (hereinafter collectively "Website") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

5.    Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

---

[1]    Internet/Broadband Fact Sheet, PEW RESEARCH CENTER (April 7, 2021) https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (last visited April 1, 2025). Indeed, the polls also show ninety-nine (99) percent of American adults between the ages of eighteen (18) to twenty-nine (29) use the Internet, and ninety-eight (98) percent of American adults between the ages of thirty (30) to forty-nine (49) use the Internet.

[2]    Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2020), https://www.disabilitystatistics.org/StatusReports/2018-PDF/2018-StatusReport_US.pdf (last visited April 1, 2025).  The report uses data from the 2018 American Community Survey.

[3]    Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited May 7, 2025).

6.     For this significant portion of Americans, accessing websites, mobile applications, and other information and online/electronic materials has become a necessity, not a convenience.

7.     The growth of usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

8.     The U.S. Chamber of Commerce has documented consumers' increasing reliance on the internet to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[4]
> New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their website design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[5]

9.     Even the Supreme Court has acknowledged the phrase, "'There's an app for that' has become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518, 203 L.Ed.2d 802, 806 (2019).

---

[4]     Emily Heaslip, *A Guide to Building an Online Store*, U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last accessed April 1, 2025).
[5]     Emily Heaslip, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping*, U.S. Chamber of Commerce (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile- friendly-ecommerce-websites (last accessed April 1, 2025). "According to one report, e- commerce is growing 23% each year[.]" Emily Heaslip, *The Complete Guide to Selling Online*, U.S. Chamber of Commerce (Jan. 28, 2020), https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last accessed April 1, 2025).

10.     But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[6]

11.     This is especially true with respect to accessing goods and services over the internet, where people with disabilities stand to benefit immensely if online services were fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[7]

12.     When digital content is properly formatted, it is universally accessible to everyone.  When it is not, the content provider fails to communicate to individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, may deny outright access to the online service.[8]

---

[6]     *National Disability Policy: A Progress Report*, Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed April 1, 2025).

[7]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119 -AA65, Answer 57 (October 7, 2016) (citations omitted).

[8]     These factors often lead disabled individuals to abandon the process of purchasing items online after they begin. Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It.*, Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get- online-customers-to-complete-purchase.html (last accessed September 8, 2023) (documenting

13.    Plaintiff Laurel Hilbert wants to be come a lawyer.  To reach that goal, he must take and

pass the LSAT examination.  Defendants offer LSAT preparatory classes and materials for

LSAT students to given them the best opportunity to pass the examination.  Unfortunately,

Mr. Hilbert cannot fully and equally access Defendant's Website because Defendants'

accessibility policies and practices have made it impossible to fully and equally perceive,

understand, or operate the Website's content with screen reader auxiliary aids.

14.    As a result, this action for injunctive relief seeks an order requiring that Defendants (a)

make their Website accessible to Mr. Hilbert, and (b) adopt sufficient policies and practices,

the details of which are more fully described below, to ensure the Website does not become

inaccessible again in the future.

15.    Defendants' denial of full and equal access to their Website and therefore denial of their

goods and services offered thereby is a violation of Plaintiff's rights under Title III of the

Americans with Disabilities Act ("ADA"), 42 U.S.C § 12182(a), and the D.C. Human

Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*.

16.    Because Defendants' Website is not equally accessible to blind and visually impaired

consumers, they violate the ADA and the DCHRA.  Plaintiff seeks a permanent injunction,

actual and compensatory damages, and reasonable attorneys' fees and costs to cause a

change in Defendants' corporate policies, practices, and procedures so that their Website

will become and remain accessible to blind and visually impaired consumers.

17.    In addition, Defendants' violation of the ADA and the DCHRA, and its ongoing

engagement in unfair or deceptive trade practices subjects them to liability under the D.C.

---

the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*  In particular, Defendants' unfair trade practices, include but are not limited to representing that the services offered on their Website and associated classes have characteristics, uses and/or benefits for blind and visually impaired persons that they do not have, representing that they have the status as an ADA-compliant and accessible Website that they do not have, representing that the Website services are of a particular standard (ADA compliant) and quality when, in fact, it is non-compliant and inaccessible to blind and visually impaired persons, offering services without the intent to sell them as offered. D.C. Code § 28-3904(a), (b), (d), (h).

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* and 28 U.S.C. § 1332.

19.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.* and the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.* ("CPPA").

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendants conduct and continue to conduct a substantial and significant amount of business in this District via the internet through the subject Website and "brick and mortar" LSAT classes addressed by this action.

21.    Defendants are subject to personal jurisdiction in this District.  Defendants have been and are committing the acts or omissions alleged herein in this District that caused some of the injury and violated the rights of Plaintiff and to other blind and visually impaired customers

in this District under the ADA, the DCHRA and the CPPA.  A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

22.     In particular, Plaintiff has been denied the full use and enjoyment of the facilities, goods, and services offered to the general public through its Website, classes and LSAT course materials.  Plaintiff lost all opportunities to take and complete the LSAT course successfully due to the discriminatory roadblocks faced as a result of Defendants' failure to provide online goods and services that he could effectively utilize as a visually impaired person.

23.     Further, these access barriers that Plaintiff encountered have caused a denial of Plaintiff's full and equal access multiple times, and now deters Plaintiff going forward from accessing the Defendant's Website and LSAT materials in the future without the aid of a sighted person to help him navigate, which is antithetical to the freedoms promised to the visually impaired by the passage of federal and state disability civil rights legislation.

24.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

25.     Plaintiff Laurel Hilbert ("Plaintiff" or "Mr. Hilbert") resides in Washington, D.C.  While in his residential home, he attempted to access Graham Holdings Company and Kaplan, Inc.'s Website to utilize an online preparation course for the Law School Admission Test ("LSAT"). Regrettably, he was unable to effectively engage with the course due to the inaccessibility of the Website, which hindered his ability to prepare for the LSAT.

26.     Not only was Mr. Hilbert injured in fact in or about January 2025 to the present, but it is inevitable that the inaccessibility of Defendant's Website will continue to injure him. Mr.

Hilbert will remain unable to adequately prepare for the LSAT if the Website is not remediated in conformity with the requirements of the Americans with Disabilities Act. The inability to fully access and navigate the online LSAT preparation course puts Mr. Hilbert at a significant disadvantage compared to other test-takers who are able to engage with the course and practice examinations without the use of assistive technology. This disadvantage carries serious consequences, including the risk of a lower LSAT score, diminished chances of admission to competitive law schools, loss of potential scholarship opportunities, and the inability to attend institutions aligned with his professional goals and qualifications.

27.    Plaintiff is a blind, visually-impaired disabled person and a member of a protected class of individuals under the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §§ 12102(1) – (2), and the regulations implementing the ADA set forth at 28 C.F.R § 36.101 *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*.

28.    Defendants Graham Holdings Company and Kaplan, Inc. ("Defendant") are and was at all relevant times companies incorporated in Virginia and Florida and do business in the District of Columbia through theirs internet-based online Website and "brick and mortar" classes.

29.    Defendants own and administer the Website https://www.kaptest.com/myaccount/ resources?pivot=true and their goods and services online and have offered them to the general public through their Website, which is a public accommodation, as well as their physical locations, within the definition of the ADA, 42 U.S.C. § 12181(7), and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*.

8

## **NATURE OF ACTION**

30.     The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, as well as many other activities for sighted, blind and visually impaired persons alike.

31.     In today's tech-savvy world, blind and visually impaired people have the ability to access websites and online platforms using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display.   This technology is known as screen-reading software. Screen-reading software is currently the only method a blind or visually impaired person may independently access the internet.   Unless websites and/or mobile applications are designed to be read by screen-reading software, blind and visually impaired persons are unable to fully access websites and the information, products, and goods contained thereon.

32.     Blind and visually impaired users of Windows operating system-enabled computers and devices have several screen-reading software programs available to them.   Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately.   Nonvisual Desktop Access, otherwise known as "NVDA", and "JAWS" are popular screen-reading software programs available for a Windows computer.   "VoiceOver" is a popular program for Apple devices.

33.     For screen-reading software to function, the information on a website must be capable of being rendered into text.   If the website content is not capable of being rendered into text, the blind or visually impaired user is unable to access the same content available to sighted users.   VoiceOver users such as Mr. Hilbert rely on a Website's features and proper coding,

including but not limited to "ARIA" ("accessible rich internet applications") through the Web Content Accessibility Guidelines ("WCAG"). ARIA provides what is presented visually for a visually impaired person.

34.    The international website standards organization, the World Wide Web Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"). WCAG 2.1 are well-established guidelines for making websites accessible to blind and visually impaired people. These guidelines include three levels of accessibility—A, AA, and AAA—with Level AA generally considered the standard for legal compliance. These guidelines are universally followed by most large business entities and government agencies to ensure their websites are accessible.

## **STATEMENT OF FACTS**

35.    Defendants Graham Holdings Company and Kaplan, Inc. ("Defendant") own and administer their online Website, offering features which should allow all consumers to access the goods and services provided via the internet throughout the United States, including the District of Columbia.

36.    Defendants' Website offers their products and services to the public. The Website offers features which ought to allow and avail consumers the ability to peruse numerous functions to complete a sought-after online course, including, as in Mr. Hilbert's case, the ability to take and complete the LSAT online course.

37.    Plaintiff Laurel Hilbert is a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software. Plaintiff is, however, a proficient VoiceOver screen-reader user and uses primarily VoiceOver to access the

internet, online programs within websites and/or mobile applications. Plaintiff has visited and attempted to access Defendants' Website using a screen-reader on numerous occasions.

38.    While residing in the District of Columbia in January through March 2025, Plaintiff visited and attempted to access Defendants' Website and online materials using screen-reading software in order to complete the LSAT online course through their Website. Regrettably, he was unable to do so due to inaccessibility issues.

39.    Despite his efforts, Plaintiff was denied a user experience similar to that of a sighted individual due to the Website's lack of a variety of features and accommodations, which effectively barred Plaintiff from being able to enjoy the privileges and benefits of Defendant's goods and services.

40.    Mr. Hilbert owns and uses a MacBook and uses Safari as his main internet browser. Safari and MacBook harnesses Apple's "Voice-Over Software" which enables blind and/or visually impaired persons such as Mr. Hilbert to access and enjoy websites by reading aloud functions on a website.

41.    Screen-reading software includes the functionality "Quick Navigation," which enables screen readers to navigate through a website using its headings, links, buttons, tables, etc. Specifically, when a screen reader types letters, they correspond to what kind of functions a screen reader uses to learn what it is that a website offers. For example, if Mr. Hilbert enables "Quick Navigation," he can navigate through a website by using its headings. He will press "H" on his keyboard once "Quick Navigation" is enabled.

42.    When websites fail to incorporate the proper and descriptive coding to mark what kinds of functions are on their website, not only does this prevent the "Quick Navigation" functionality to locate the functions on the website but the read-aloud functions that lack

description confuse software users like Mr. Hilbert who cannot rely on any visuals to navigate through and access a website.

**Inaccessibility of Website**

43.   On or about January 2025 through the end of March 2025, Mr. Hilbert noticed that the Website's buttons and links failed to abide by the WCAG Guidelines due to their improper labelling and coding.

44.   Specifically, after having logged into the Kaplan platform, Mr. Hilbert navigated to the top of the page. From that point, he started to navigate forward using the right arrow. Next came a link that reads "Kaplan Test Preplink," followed by another link that reads "Shopping cart link". He continued navigating forward using the right arrow, and what followed was a heading that reads "Heading Level 1 Kaplan Resources," followed by another heading that reads "Heading Level 2 My Active Resources," followed by a third heading that reads "Heading Level 3 LSAT Life Online Course" followed by a link that reads "Access Resources Link".

45.   Mr. Hilbert continued to navigate forward, and what followed were several elements that are labeled as "Hide Details Clickable", "See Schedule Clickable", "See Enrollment Agreement Clickable", "Visit Community Clickable", "Find A Makeup Session Clickable", "Access Digital Books Clickable", "Extend Course Clickable", "Print Receipt Clickable" and "See Payment Details Clickable". Clickable elements prevent screen reading software from navigating a website more quickly and more efficiently by single-key navigation or by using the tab key, thus rendering this method of coding obsolete.

46.   Mr. Hilbert navigated backward and selected a link that reads "Access Resources Link". Once selected, the Website appears to have opened a new page titled "Welcome To Study

Plan LSAT Live Online Course". He navigated to the top of the previously mentioned page, and from that point, he started navigating using the right arrow to navigate forward and was presented with several buttons that read "Core Sessions Collapse Button," "Practice Library Collapse Button," "Explanation PDFS Collapse Button."

47.    Mr. Hilbert expanded the button that reads "Practice Library Collapse Button" and started navigating using the right arrow to navigate forward. What followed were several links that read "Link LR Mastery Assignments 1 of 6", "Link RC Mastery Assignments 2 of 6", "Link Timing Sections 3 of 6", "Link Digital PrepTest Library – August 2024 (No LG) Format 4 of 6", "Link Digital PrepTest Library – Up To June 2024 Format 5 of 6", "Link LSAT Writing Sample Prompts 6 of 6".

48.    Mr. Hilbert selected the link that reads "Link LR Mastery Assignments 1 of 6" and, when selected, the platform navigated him to a page with the first heading that reads "Heading Level 1 Study Plan". From that point, he started navigating using the right arrow to navigate forward, and what followed was a button that read "Logical Reasoning Mastery Button".

49.    Mr. Hilbert selected the previously mentioned button, and **there was no auditory feedback given as to what had happened, if anything**. What followed was a statement that reads, "These Mastery Assignments each contain 10-15 Logical Reasoning questions. Mastery practice is meant to be done untimed. Focus on properly implementing the methods and strategies. You can either complete the assignments online, or you can print the assignments by downloading the Mastery Assignment PDF, and then click through the online interface to enter your answers to see your performance and the explanations." What followed was the title of the first mastery assignment that reads "Main Point Qs: Foundations 1".

50.    Mr. Hilbert navigated forward to a link that reads "Link Resume Main Points Qs Foundations 1". Once selected, the Website presented a page with the heading that reads "Heading Level 1 Main Point Qs Foundations 1". What followed was a statement that reads "You may resume the quiz now by clicking on the button below". He navigated even further and selected the button that reads "Resume Quiz Button". **He received no auditory feedback as to what had happened, if anything**.

51.    Mr. Hilbert used his left arrow to navigate away from it, then his right arrow to navigate back to it, and the button appeared to be unchanged and continued to read "Resume Quiz Button". He selected the previously mentioned button once again, but the results were the same as the first, where the Website did not navigate him to the quiz he was attempting to take.

52.    Mr. Hilbert asked a sighted person to look at the screen when he selected the previously mentioned button, and the friend informed him that when the button is pressed, the quiz shows visually, but the positioning of the cursor of the screen reading software remains on the button that reads "Resume Quiz".

53.    Mr. Hilbert navigated backward to the main navigation and expanded the button that reads "Practice Library Expanded Button" and selected the second link that reads "Link RC Mastery Assignments 2 of 6". Once selected, the Website navigated him to a new page with the heading level 1 that reads "Heading Level 1 Study Plan". What followed was a button that reads "Reading Comprehension Mastery Button," and once selected, **no auditory feedback is given as to what had happened, if anything**. What followed was a button that reads "Mixed Topic RC: Foundations 1 Collapsed Button".

54.　Mr. Hilbert selected the previously mentioned button, and what followed was a statement that reads "Not Started." He attempted to start the previously mentioned assignment, and when he tried to select "Not Started", the Website presented him with a link that reads "Start Mixed Topic RC: Foundations 1 link". He selected the previously mentioned link, and the Website appeared to display a new page with the heading that reads "Heading Level 1 Mixed Topic RC: Foundations 1," followed by a statement that reads, "You have not started this online quiz yet. Click the Start quiz button below".

55.　Mr. Hilbert navigated further using his right arrow to a button that reads "Start Quiz Button". He selected the previously mentioned button and, true to form, nothing happened. He navigated away from the button using his left arrow, then navigated back to it using his right arrow, and the button appeared to be unchanged.

56.　Mr. Hilbert asked a sighted friend to verify whether something happens when the previously mentioned button is selected, and the friend verified that the quiz shows behind the page where the cursor of the screen reading software remains, and there would not be a way for a screen reading software user to navigate to that page using keyboard navigation. **He was left disappointed and unable to move any further in accessing the diagnostics test or the LR and RC mastery quizzes**.

57.　To test out the accessibility of the diagnostics test, Mr. Hilbert asked a sighted friend to navigate to it and found the following issues: when selecting any of the multiple choice options—whether that would be A, B, C, or D—**he received no auditory feedback that his selection had registered**, thus the platform prevented him from knowing with certainty whether or not his selection had registered. With such a high-stakes test, guessing should be out of the question.

58. In addition to the improper coding and labelling, **the Website also fails to implement auditory feedback for screen-reader software users**.

59. When companies fail to implement auditory feedback into their websites, screen-reader software users who solely rely on audio are left confused and are forced into a situation where they need to scavenge through a website to merely understand what functions they have successfully interacted with.  This not only requires screen-reader software users to waste a significant amount of time to understand what functions are available to them on a given website, but it often prevents them from being able to access and independently enjoy a website as their sighted counterparts.

60. Due to the Website's accessibility issues, Mr. Hilbert was ultimately unable to take, let alone complete, the online LSAT course.

### Mr. Hilbert Contracts Kaplan's Support Team For Help To No Avail

61. On or about January 11, 2025, Mr. Hilbert contacted Defendant Kaplan's support team and informed them of the accessibility issues using the email address: accessibility@kaplan.com. He also scheduled a meeting with Audra Waterhouse Holly from the Kaplan Accessibility Team, to discuss with them the accessibility issues, and shared with them his screen demonstrating the accessibility issues.  However, the issues were never resolved after multiple conversations.  Shockingly, rather than fixing the problems at that time, Mr. Hilbert was told that updates would be made "at a later date."

62. These access barriers effectively denied Plaintiff the ability to use and enjoy Defendants' Website and LSAT materials the same way sighted individuals do.

63. On or about April 3, 2025, the Kaplan Accessibility Team emailed Mr. Hilbert with details it claimed would allow him accessibility to Defendants' Website and course materials.

16

64.    Defendants made multiple assertions, which were false.

65.    First, Defendants asserted that Mr. Hilbert "received the accessible versions of the LSAT Course books." However, they failed to recognize the distinction between "technical format" and "functional accessibility". The materials provided were in PDF format—a format that is not inherently accessible for blind users, especially when it comes to efficient navigation and active study. If Mr. Hilbert had intended to prepare for the LSAT by merely reading a book, he would have opted for an accessible audiobook version compatible with his Victor Reader, which supports essential study features like bookmarking, chapter navigation, and seamless page-by-page review.

66.    Defendants' PDF materials, by contrast, require line-by-line reading and offer no comparable navigational control or usability. This undermines Mr. Hilbert's ability to study with the same ease, flexibility, and efficiency afforded to sighted students using printed or interactive digital materials. Defendants' choice to provide content in a static, minimally navigable format constitutes an inadequate accommodation and reflects a fundamental misunderstanding of what accessibility truly means for blind users preparing for a high-stakes exam like the LSAT.

67.    Second, Defendants asserted: "You have access to Kaplan's platform allowing you to join the Live Online scheduled sessions (12 sessions total) from the Study Plan. These core sessions are the foundation of the course and taught by expert instructors. We also offered to introduce you to the instructor teaching those sessions in case it may be helpful but you did not respond to that offer."

68.    While it is true that Mr. Hilbert technically had access to the Live Online scheduled sessions, Defendants' statement conveniently ignores the fact that these lectures are only

one component of the broader LSAT preparation package Mr. Hilbert purchased. The course was marketed and structured to include not just live instruction, but also essential interactive practice elements—such as Logical Reasoning (LR) mastery points, Reading Comprehension (RC) quizzes, and other exercises that are critical for applying the concepts taught during lectures. The inaccessibility of these practice components renders the overall course incomplete and ineffective for blind students.

69.    Furthermore, Defendants' mention of offering to introduce Mr. Hilbert to the instructor is not a meaningful accommodation—every student has access to the instructor, and he was and is fully capable of reaching out independently, just like any other student. Framing this as a special offer is disingenuous and fails to address the real issue: the lack of access to core course content that is necessary for meaningful LSAT preparation.

70.    Next, Defendants asserted: "You have access to LSAC[9]'s practice exams and on your Study Plan they are noted as the Diagnostic, MidPoint and Final Test in the course schedule at the beginning, midpoint and end of the course. These official exams belong to LSAC and are linked to the LSAC platform for your convenience. Accessible files with the explanation of answers to these practice exams are with our vendor and will be in the dropbox we created for you by April 9th."

71.    Defendants' reference to "LSAC's official practice exams" is misleading and avoids accountability. While it is true that these exams are developed and owned by the Law School Admissions Council ("LSAC"), Defendants chose to "embed" them within their

---

[9]    "LSAC" or the Law School Admission Council "is a not-for-profit organization whose mission  is to advance law and justice by promoting access, equity, and fairness in law school admissions and support the learning journey from prelaw through practice." *See* www.lsac.org/about.

own course platform—meaning they are subject to Defendants' accessibility limitations. Had Mr. Hilbert accessed these exams directly through the LSAC platform, he would have encountered a fully accessible experience. LSAC's platform meets WCAG standards and is, in Mr. Hilbert's experience, one of the most accessible testing environments available.

72.     Unfortunately, Defendants' platform does not meet that same standard. By integrating LSAC's exams into an inaccessible framework, Defendants have effectively rendered those otherwise accessible materials unusable for blind students.

73.     Furthermore, the suggestion that answer explanations will be placed in a Dropbox folder at a later date only underscores Defendants' ongoing failure to deliver a cohesive, equitable experience. Mr. Hilbert, like other students, does not study on Defendants' timetable, nor should he be expected to rely on delayed, disjointed file drops in order to prepare for a time-sensitive, high-stakes exam. This fragmented approach deprives Mr. Hilbert of the same seamless, structured, and interactive learning experience that is readily available to sighted students, and constitutes a clear failure to meet Defendants' obligations under federal and state disability rights laws.

74.     Next, Defendants asserted: "You have access to more than 55+ full-length practice tests with LawHub Advantage through your license with LSAC. Our understanding is that LSAC's platform is accessible and meets WCAG standards."

75.     Again, Defendants' reference to the accessibility of LSAC's LawHub Advantage platform is irrelevant to the core issue at hand. LSAC is not the subject of this Complaint— Defendants are. Mr. Hilbert's license with LSAC and access to their accessible platform exists independently of Kaplan and is not a substitute for the comprehensive LSAT preparation experience Defendants market and sell.

76.    Defendants' legal obligations under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act apply to their own course materials, delivery systems, and platform—not to those of third parties. Pointing to LSAC's accessible resources does nothing to excuse Defendants' failure to ensure their own content is equally accessible to blind users. This attempt to redirect attention to another organization's compliance does not absolve Defendants of responsibility. The issue remains: Defendants' platform is inaccessible, and that inaccessibility is depriving Mr. Hilbert—and others like him—of the full and equal access to LSAT preparation promised and paid for.

77.    Fifth, Defendants asserted: "There are optional practice questions (quizzes) in Kaplan's Practice Library for students who desire additional practice. These quizzes are migrating to a new learning management platform. In the meantime, we are providing them as accessible files. The files are with our vendor and will be added in the Dropbox as they come in from the vendor and estimated by the end of the month."

78.    This assertion suffers from the same problems with timing as the prior assertion.

79.    Defendants' characterization of the practice quizzes as "optional" is not only inaccurate but misleading. These quizzes are an essential component of the LSAT preparation course and are marketed as such. They are integral to reinforcing skills taught in the live sessions and to achieving mastery in Logical Reasoning, Reading Comprehension, and Analytical Reasoning—all of which are central to success on the LSAT.

80.    The claim that these materials are "migrating to a new platform" does not relieve Defendants of their responsibility to ensure accessibility *now*. The current platform remains inaccessible to blind users and that is the platform Defendants continue to operate and

require students to use. Students preparing for the LSAT do not have the luxury of waiting until Defendants decide to update their systems.

81.     Mr. Hilbert was preparing for a fixed exam date in June 2025, not on Defendants' flexible or speculative timeline. Furthermore, Defendants' reliance on vendors and file drops—without integration, interactivity, or timely delivery—only serves to widen the gap between blind and sighted students. Providing fragmented files at an undefined later date is not accessibility; it is delay and discrimination dressed up as accommodation. Promises of future improvements do not excuse present violations of federal and state disability laws.

82.     Finally, Defendants made the following offer: "We also offered a human reader to read practice exam questions in a timed or untimed session, but you did not respond to that offer."

83.     Defendants' offer to provide a human reader is not a sufficient or equitable solution. First, the offer applied only to full-length practice exams—not to the broader set of practice quizzes, including mastery quizzes and Reading Comprehension exercises, which are a major and indispensable component of the preparation package. In fact, these quizzes represent the bulk of the interactive learning experience, while full-length practice exams make up only a smaller portion of the curriculum.

84.     Second, relying on a human reader to complete a nearly three-hour practice exam is not a desirable or practical solution. It strips blind students of the ability to work independently, review at their own pace, and engage with the material on their own terms—privileges sighted students enjoy by default. The purpose of test preparation is not only to understand content, but to simulate the real exam experience in a self-directed way. Forcing blind

students to rely on a third party to read materials aloud is an outdated workaround that perpetuates inequity and undermines autonomy.

85. Defendants are obligated to provide "equal" access—not dependent access. Substituting human readers for platform accessibility does not meet that standard and reflects a failure to design their offerings in a way that respects the dignity and independence of blind learners.

86. After Mr. Hilbert responded to Defendants in a good faith effort to persuade them to move expeditiously to provide an accessible learning experience for him, Defendants responded on or about April 15, 2025 with further claims regarding "alternative accessibility measures". All alleged measures remain insufficient and denied Mr. Hilbert accessibility to take and complete the LSAT preparatory course offered by Defendants.

87. Specifically, Defendants claimed that its PDF files meet WCAG standards and include bookmarks and tags. But again, technical compliance does not equal usability. These files are not practically navigable for blind users and lack the tools Mr. Hilbert needed to study effectively—bookmarking, fast chapter review, or meaningful interaction. The fragmented, Dropbox-based delivery system only compounds this. If he wanted a static reading experience, he would have purchased audiobooks that work with his Victor Reader, not a dynamic course.

88. Defendants again offered a human reader, but that was and is not a real solution. It shifts the burden back onto the student. It erodes autonomy and makes independent learning impossible. What Defendants fail to understand is that a sighted student can study whenever they want—at two in the morning, during a lunch break, late at night, or in a

moment of unexpected free time. That flexibility is built into the structure of digital learning.

89.    However, under Defendants' model, Mr. Hilbert would be forced to plan his study schedule around the availability of a third party. If a human reader is unavailable, he is stuck. That restriction introduces delays, limits flexibility, and forces him into an unnatural and inflexible study routine that sighted students are never subjected to. It is not equal, and it is not access.

90.    Additionally, Defendants' offer was originally limited to full-length tests. Only after Mr. Hilbert challenged them did they retroactively extend the offer to other parts of the course. Given the shortcomings sighted above with human readers, that move reads more like a legal defense strategy than a meaningful commitment to accessibility.

91.    Defendants again relied on Dropbox to drip content over time, which, againm is not an accessible or integrated solution. It is a workaround that made Mr. Hilbert's study process chaotic and inefficient. Sighted students get a seamless, interactive experience. Mr. Hilbert, on the other hand, received folders and files with no structure or continuity—none of which he could use in tandem with the core course features.

92.    Defendants again pointed to LSAC's accessible platform as if that offsets their own inaccessibility. It does not.   Mr. Hilbert's LSAC license exists apart from Kaplan. Embedding LSAC materials in Defendants' own inaccessible platform actually creates another barrier, not a solution.

93.    Mr. Hilbert registered for Kaplan's LSAT course in January 2025, with the goal of taking the LSAT exam this June 2025. But because of Defendants' delay in responding, their fragmented approach to accessibility, and their refusal to treat this as an urgent matter, Mr.

Hilbert is no longer in a position to take the LSAT in June. He lost over three critical months of preparation time while waiting for them to act on issues he raised from the start. That harm is measurable and direct.

94.    In the end, Mr. Hilbert spent $1,299.00 for Defendants' LSAT course, which was riddled with inaccessibility and Defendants' apparent inability to make in accessible for him in an expeditious manner so that he could study independently and be ready to tackle the LSAT exam in June 2025.

95.    Upon information and belief, Defendants' policies and practices denied Plaintiff, along with other blind or visually impaired users, access to Defendants' Website. Those policies and/or practices therefore specifically denied the goods and services that are offered to the general public.

96.    Due to Defendants' failure and refusal to remove access barriers to their Website, Plaintiff and visually impaired persons have been and are still being denied equal access to Defendants' Website, and the numerous goods, services and benefits offered to the public through the Website.

97.    The access barriers Plaintiff encountered have caused a denial of his full and equal access in the past and now deter Plaintiff going forward from utilizing the Website, presently and in the future.

98.    If the Website was equally accessible to all, Plaintiff could independently navigate the Website and access and complete the desired LSAT preparatory course through Defendants' Website and in-person classes as sighted individuals do. He also would not have to use the services of a sighted person to perform simple transactions and interactions with Defendants' Website. It is humiliating for a visually impaired person to rely upon the

largess of sighted strangers to navigate through the world.  The internet world is no different.

99.    Through his attempts to use the Website, Plaintiff has actual knowledge of the access barriers that make these services inaccessible and independently unusable by blind and visually impaired persons.

100.   Because simple compliance with the WCAG 2.1 Guidelines would provide Plaintiff and other visually impaired consumers with equal access to the Website, Plaintiff alleges that Defendants have engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

a.   Constructing and maintaining Website that is inaccessible to visually impaired individuals, including Plaintiff;

b.   Failing to construct, update and maintain Website that is sufficiently intuitive so as to be equally accessible to visually impaired individuals, including Plaintiff; and

c.   Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually impaired consumers, such as Plaintiff, as a member of a protected class.

101.   Defendants therefore use standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

102.   The Americans with Disabilities Act ("ADA") expressly contemplates the injunctive relief that Plaintiff seeks in this action.  In relevant part, the ADA requires:

> In the case of violations of … this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities … Where appropriate, injunctive relief shall also include requiring the … modification of a policy …

42 U.S.C. § 12188(a)(2).

25

103.　Upon information and belief, because Defendants' Website has never been accessible, and Defendants do not have, and never had, an adequate corporate policy that is reasonably calculated to cause their Website to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

　　a.　That Defendants retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed Upon Consultants") who shall assist it in improving the accessibility of its Website so that the goods and services on them may be equally accessed and enjoyed by individuals with vision-related disabilities;

　　b.　That Defendants work with the Mutually Agreed Upon Consultant to ensure that all employees involved in their Website's development and content development be given web accessibility training on a periodic basis at least two (2) times per year, including onsite training to create accessible content at the design and development stages;

　　c.　That Defendants work with the Mutually Agreed Upon Consultant to perform an automated accessibility audit on a periodic basis at least two (2) times per year to evaluate whether their Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

　　d.　That Defendants work with the Mutually Agreed Upon Consultant to perform end-user accessibility/usability testing on a periodic basis at least two (2) times per year with said testing to be performed by individuals with various disabilities to evaluate whether their Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

e.  That Defendants work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on their Website, along with an e-mail address and tollfree phone number to report disability accessibility-related problems; and

f.  That Defendants and their computer and/or internet experts monitor Defendants' Website for up to two (2) years after the Mutually Agreed Upon Consultant validates that the Website is free of accessibility errors/violations to ensure that they have adopted and implemented adequate accessibility policies.

g.  That Defendants provide Plaintiff's counsel and this Court a report every six (6) months of their efforts to comply and its continued compliance with the ADA, including a representation and warranty that their Website is free of accessibility errors/violations and to ensure that they have adopted and implemented adequate accessibility policies, which remain legally compliant with disability laws, functional and up-to-date.

104.  Web-based technologies have features and content that are modified on a daily, and in some instances, hourly basis and a one-time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies.  To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful and legally-compliant manner that will cause the website and/or mobile applications to remain accessible, Defendants' Website must be reviewed on a periodic basis not less than two (2) times per year using both automated accessibility screening tools and end user testing by disabled individuals.

105.  Although Defendants may currently have centralized policies regarding maintaining, updating and operating their Website, Defendants lack a plan and policy reasonably

calculated to make them fully and equally accessible to, and independently usable by, blind and other visually impaired consumers.

106.    Defendants have, upon information and belief, invested substantial sums in developing and maintaining their Website and have generated significant revenue from its Website. These amounts are far greater than the associated cost of making their Website equally accessible to visually impaired customers.

**107.**    Without injunctive relief, Plaintiff and other visually impaired consumers will continue to be unable to independently use the Website, violating their rights.

**FIRST CAUSE OF ACTION**
**<u>Violation of the Americans with Disabilities Act</u>**
**(42 U.S.C. § 12181 *et seq.*)**

108.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

109.    Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

110.    Defendants' Website and associated in-person classes are together a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See also Martinez v. Gutsy LLC*, 2022 U.S. Dist. LEXIS 214830, 2022 WL 17303830, at *1, 7 (E.D.N.Y. Nov. 29, 2022) (on a motion to dismiss, holding that plaintiff plausibly stated a claim of discrimination due to allegedly inaccessible website); *Del-Orden v. Bonobos, Inc.*,

2017 U.S. Dist. LEXIS 209251, 2017 WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017) (same);

*Romero v. 88 Acres Foods, Inc.*, 580 F.Supp.3d 9, 19 (S.D.N.Y. 2022) (collecting cases).

111. The Website is a service offered to the general public and, as such, must be equally accessible to all potential consumers.

112. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

113. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

114. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

115.   The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

116.   Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

117.   Furthermore, Plaintiff has been denied full and equal access to the Website offered by Defendants, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons.  Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct.  These violations are ongoing.

118.   Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

**SECOND CAUSE OF ACTION**
**Violation of the DCHRA**
**(D.C. Code §§ 2-1401, *et seq.*)**

119.   Plaintiff repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

120.   Defendants utilizes their Website in conjunction with their physical training and testing locations in the District of Columbia.

121.   The DCHRA makes it "… an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived: … disability… of any individual: (1)  To deny, directly or indirectly, any person the full and equal  enjoyment  of  the  goods,  services,  facilities,  privileges,  advantages,  and

accommodations of any place of public accommodations." D.C. Code § 1-1402.31(a)(1). Defendant is systematically violating the DCHRA.

122.    In addition, "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 1-1402.68.

123.    Defendants are a "place of public accommodation" within the meaning of the DCHRA because they are a "… person or place that provides, to a person in the District, access to an accommodation, service, or good, whether or not that person or place maintains a physical location in the District or charges for those goods or services, such as inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest," which includes their physical facility and their goods and services offered to consumers in the District of Columbia through their Website.

124.    Defendants' Website is a service provided by Defendants that is inaccessible to patrons like Mr. Hilbert who are visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendants make available to the non-disabled public.  Defendants have violated the DCHRA by denying visually impaired customers the services and products provided by the Website.  These violations are ongoing.

125.    Defendants' actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the DCHRA because Defendants constructed and/or maintains their Website, which is inaccessible to Plaintiff, knowingly maintain their Website in this

inaccessible form, and have failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

126.  Defendants' actions also constitute a discriminatory practice against Plaintiff on the basis of disability in violation of the DCHRA because the Website "… [has] the effect or consequence of violating any of the provisions of this chapter…." D.C. Code § 1-1402.68.

127.  Defendants are also violating the DCHRA because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 *et seq.* Courts look to case law interpreting the Americans with Disabilities Act ("ADA") in construing comparable provisions of the DCHRA where no controlling precedent from the D.C. Court of Appeals exists. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001).

128.  Defendants' actions were and are in violation of the DCHRA and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination.

129.  Plaintiff is also entitled to a preliminary and permanent injunction enjoining Defendants from violating the DCHRA and requiring Defendants to take the steps necessary to make their Website readily accessible to and usable by visually impaired individuals.

130.  Defendants' denial of an accessible Website and their discrimination against Plaintiff renders them jointly and severally liable for each and every offense for the actual and special damages in an amount to be determined by a jury, and reasonable attorney's fees and costs that may be determined by the Court.  D.C. Code § 2-1403.16.

### THIRD CAUSE OF ACTION
### <u>Violation of the CPPA</u>
### (D.C. Code §§ 28-3901, *et seq.*)

131.  Plaintiff realleges and incorporates by reference the prior paragraphs as if fully set forth

herein.

132. The D.C. Consumer Protection Procedures Act ("CPPA") is "construed and applied liberally" to protect a consumer's "right to truthful information about consumer goods and services" purchased or received in the District of Columbia. *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1004 (D.C. 2020) (*citing* D.C. Code § 28-3901(c); *see also* D.C. Code § 28-3905(k)(1)(A) (providing private right of action)).

133. Any person, whether acting for their self-interests or the general public, may bring an action under the CPPA to seek relief by any person of an unfair and/or unlawful trade practice in violation of D.C. law. D.C. Code § 28-3905 (k)(1) (2009).

134. While the CPPA enumerates a number of specific unlawful trade practices, the enumeration is not exclusive. *Dist. Cablevision Ltd. P'shp v. Bassin*, 828 A.2d 714, 723 (D.C. 2003).

135. Trade practices that violate other laws, including the common law, also fall within the purview of the CPPA. The CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by D.C. Code § 28-3904, but to all other statutory and common law prohibitions. *Id*.; *Osbourne v. Captial City Mortg. Corp.*, 727 A.2d 322, 325-26 (D.C. 1999). Prohibitions under the DCHRA, including disability discrimination, are included prohibitions.

136. CPPA violations occur when a person makes a representation that goods or services have characteristics or qualities that they do not have, D.C. Code § 28-3904(a); makes a representation that the person has a status that the person does not have, D.C. Code § 28-3904(b); makes a representation that goods or services are of particular standard or quality, if in fact they are of another, D.C. Code § 28-3904(d); and/or advertises services without the intent to sell them as advertised or offered, D.C. Code § 28-3904(h).

137.    The consumer "need not prove that [he] was 'misled, deceived, or damaged' by a merchant's actions[,]" D.C. Code § 28-3904, nor "always prove that the merchant made an intentional misrepresentation under the CPPA." *Frankeny*, 225 A.3d at 1004.

138.    Under the CPPA, Plaintiff is a consumer of Defendants, a merchant selling services through the internet and in person.

139.    In addition, a reasonable person would find that Defendants' representation of ADA accessibility on their Website and otherwise was a fact, when, in reality, at least their Website and LSAT preparatory materials were, and are, not accessible to the blind and visually impaired persons.

140.    The CPPA "affords a panoply of strong remedies, including treble damages, punitive damages, and attorneys' fees, to consumers who are victimized by unlawful trade practices." *Frankeny*, 225 A.3d at 1004 (*Ford v. Chartone, Inc.* 908 A.2d 72, 81 (D.C. 2006) (citation and internal quotation marks omitted).

141.    In addition to the direct damages of $1,299.00 spent by Plainiff for a useless LSAT program due to his failure to take online LSAT coursework on multiple occasions as specified above through Defendants' Website, he seeks as damages in this action against Defendants up to treble liquidated damages and attorneys' fees and costs as a consumer of Defendants as a result of their unlawful trade practices.

142.    Corporate officers are personally liable when they participate in, inspire, or fail to prevent unlawful trade practices under the CPPA. *Cooper v. First Gov. Mortg. & Investors Corp.*, 206 F. Supp. 2d 33, 36 (D.D.C. 2002); *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C. 2000).

143. Individual liability under the CPPA is appropriate where a corporate officer participates directly in the deceptive practices or had authority to control those practices, and had or should have had knowledge of those practices. *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015).

144. Plaintiff reserves his right to amend this Complaint to add corporate officers responsible for such deceptive practices or who had authority to control those practices but knowingly failed to do so.

145. Defendants are liable jointly and severally for all damages suffered by Plaintiff under the CPPA, justifying an award of actual damages, up to treble liquidated damages, punitive damages, and attorneys' fees and litigation costs, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**<u>Declaratory Relief</u>**

146. Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

147. An actual controversy has arisen and now exists between the parties in that Plaintiff contends and is informed and believes that Defendants deny that their Website contains access barriers denying blind and/or visually impaired customers the full and equal access to the products, services and facilities contained in their Website, which Defendants own, operate and control, fail to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act and the DCHRA, prohibiting discrimination against the blind and visually impaired, as well as the CPPA.

148. A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.      For a judgment that Defendants, jointly and severally, violated Plaintiff's rights under the ADA, the DCHRA and the CPPA;

B.      A preliminary and permanent injunction prohibiting Defendants from violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182, *et seq.*, the DCHRA and the CPPA;

C.      A preliminary and permanent injunction requiring Defendants to take all steps necessary to make their Website fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the Website is regularly accessible to and usable by blind and visually impaired individuals;

D.      A declaration that Defendants own, maintain, and/or operate their Website in a manner that discriminates against the blind and visually impaired persons, and which fails to provide access for persons with disabilities as required by the ADA and the DCHRA and which violates the CPPA;

E.      Economic, compensatory and/or punitive damages under the DCHRA, as applicable, as well as up to treble liquidated damages under the CPPA in an amount to be determined at trial;

F.      Pre- and post-judgment interest;

G.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

H.      Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: May 7, 2025                              Respectfully submitted,

                                               **ERIC SIEGEL LAW, PLLC**

                                               By ___/s/ Eric L. Siegel_____
                                               Eric L. Siegel (DC Bar No. 427350)
                                               esiegel@ericsiegellaw.com
                                               James E. Miller (DC Bar No. 1035476)
                                               jmiller@ericsiegellaw.com
                                               888 17th Street, N.W., Suite 1200
                                               Washington, D.C. 20006
                                               (771) 220-6116 (Office)
                                               (202) 223-6625 (Facsimile)

                                               *Attorneys for Plaintiff Laurel Hilbert*

## VERIFICATION

I, Laurel Hilbert, have read the factual allegations of this Verified Complaint for which I provided direct personal experience and information pertaining to the inaccessibility of Defendants' Websites and verify under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.  Executed on ____5/7/2025_____.

                                               _____
                                               Laurel Hilbert, Plaintiff